# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THOMAS FENZL,

       Plaintiff,

vs.                                  Civ. No. 04-0339 JH/LFG

PERRYN COLLIER, an agent with
the Federal Bureau of Investigation, in
his official and individual capacities,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on *Defendant Special Agent Perryn Collier's Motion to Dismiss Based on Qualified Immunity* [Doc. No. 9], which by Order dated December 9, 2005, the Court has converted to a motion for summary judgment. The issue presented by the motion is whether Defendant is entitled to qualified immunity on Count I of the Complaint, which asserts a claim for unlawful search and seizure in violation of the Fourth Amendment. After a careful review of the law, the pleadings, the affidavits, and the arguments of the parties, the Court concludes that the motion  is well taken and should be **GRANTED**.

## <u>BACKGROUND</u>

This case arises from an investigation of the Plaintiff, Thomas Fenzl ("Fenzl"), conducted by the Federal Bureau of Investigations ("FBI"). The facts, viewed in the light most favorable to the Plaintiff, are as follows.

In March of 2001, FBI Special Agent Collier ("Collier") sought a search warrant of Fenzl's residence on the grounds that he had reasonable cause to believe that Fenzl "knowingly and

intentionally access[ed] a protected computer without authorization and did recklessly cause damage to the...computer network" in violation of 18 U.S.C. § 1030(5), and provided an affidavit in support of the warrant to the magistrate judge.  Affidavit [of Perryn Collier] dated March 23, 2001 (hereafter, "First Collier Affidavit"), attached as Exhibit 1 to Complaint, at ¶ 36.  Collier presented the First Collier Affidavit to United States Magistrate Judge Don Svet, who in turn signed a search warrant authorizing the FBI to search Fenzl's property for computer equipment and software.  Accompanied by other FBI agents, Collier searched Fenzl's residence and garage on March 26, 2001.  In connection with the motion presently before the Court, Collier also submitted an affidavit [Doc. No. 11] dated August 2, 2004 (hereafter, "Second Collier Affidavit"), which is substantially similar to the affidavit he presented when seeking the warrant. In both affidavits, Collier attests that in his investigation he discovered sufficient factual basis to establish probable cause to believe that Fenzl had committed a crime.  However, Fenzl contends that much of the alleged factual basis is false and that Collier acted in bad faith.

According to his affidavits, Collier's investigation revealed that Fenzl acted as a computer consultant for Verde Heights Publications, Inc. ("VHP") in Las Vegas, New Mexico.  Second Collier Affidavit at ¶ 11.  VHP provides web-hosting facilities for local and international customers.  *Id.* at ¶ 8.  VHP also provides high-speed Internet connectivity under the name ZiaLink.  *Id.*  EuroDebit Systems, Inc. ("EuroDebit") is a third-party transaction processing company offering online checking, debit and credit card processing services for the European market.  *Id.* at ¶ 7.  Like VHP, EuroDebit is headquartered in Las Vegas, New Mexico.  *Id.*  Bernard Schaer ("Schaer") is the Chief Executive Officer of both VHP and EuroDebit, which are closely related corporations.  *Id.* at ¶¶ 8, 14.  Genesys Computer Sales and Services ("Genesys"), also located in Las Vegas, New Mexico, is a computer

2

store which serves as a point of contact for ZiaLink customers. *Id.* at ¶ 10.

In March of 2000, Fenzl entered into a contract with VHP to perform computer services for VHP and ZiaLink. *Id.* at ¶ 11. As a condition of his employment, VHP provided Fenzl with a "point-to-point T1 clear channel connection" from Fenzl's residence to VHP. *Id.* This connection provided Fenzl with immediate and efficient access to the VHP computer network. *Id.* At the conclusion of the contract, Fenzl would provide additional consulting services at $25 per hour as long has VHP provided Fenzl with T1 access to its computers. *Id.* at ¶ 11. The investigation revealed that, beginning May 10, 2000, Fenzl also became the computer network administrator for EuroDebit. *Id.* at ¶ 12. As the Network Administrator for EuroDebit, Fenzl had system administrator privileges on both EuroDebits's and VHP's computer networks. *Id.* at ¶ 12. As part of his duties as EuroDebit's network administrator, Fenzl designed a "virtual private network" ("VPN") linking EuroDebit's subsidiaries. *Id.* However, instead of designing the VPN so that all computer communication traffic would be routed through the main EuroDebit computer network, Fenzl routed that traffic through the computer network maintained and controlled by him at his home in Las Vegas, New Mexico. *Id.*

On November 15, 2000, Fenzl resigned from EuroDebit due to dissatisfaction with his compensation, stating that "the current paycheck which I just received is an exact reflection of the attitude and environment I refuse to deal with." *Id.* at ¶ 14. After the resignation, Schaer did not immediately disconnect the T1 connection between Fenzl's home and VHP's network for fear of retaliation by Fenzl against either VHP or EuroDebit. *Id.* at ¶¶ 6, 14. During the course of his investigation, Collier learned that on February 17, 2001, Fenzl's wife, Dragica "Dora" Fenzl, told Schaer that her husband was using the T1 connection between the Fenzl home and VHP for unspecified illegal purposes. *Id.* at ¶ 6, 15. However, Dora Fenzl denies making any such statements

3

to Schaer. Dora Fenzl Aff., attached as Ex. 1 to Doc. No. 34. On February 19, 2001, Schaer decided to terminate the connection because he was concerned about the possibility it was being used for illegal purposes. Second Collier Aff. at ¶ 6. Thirty minutes after the line was physically disconnected, Genesys Computers appeared to have been the subject of a "denial of service" attack which effectively interrupted all VHP and Genesys computer communications. *Id.* and *id.* at ¶ 17. A denial of service attack is an attempt by an attacker to overload a computer network and reduce a legitimate user's bandwidth, prevent access to a service, or disrupt service to a specific system or user. *Id.* at ¶ 6. The February 19, 2001 denial of service attack was directed at ZiaLink's point of contact, Genesys' T1 line. *Id.* at ¶ 17. The intruder also changed the configuration of computer hardware and changed password files, rendering Genesys' computer network inoperable and delaying its restoration. *Id.* at ¶ 18.

On February 20, 2001, the ZiaLink computer network began experiencing authentication problems, which means that its system was unable to verify that users were authorized to access the network. First Collier Aff. at ¶ 27. As a result, individuals trying to gain access to the Internet via ZiaLink either were unable to connect or were disconnected. *Id.* On February 20, 2001, one of the last account users logged in to the ZiaLink system was "jester88," who also happened to be logged in at the time of the denial of service attack on ZiaLink the previous day. *Id.* at ¶ 29. The owner of the "jester88" account, a close personal friend of Fenzl, informed Schaer that he was not logged on at the time of the attack, and that the only other individual who would know his account information was Fenzl because he had set up the account. *Id.* at ¶ 33. Schaer knew the "jester88" account holder and his wife, and did not believe that either one was sufficiently knowledgeable to carry out the attack. *Id.*

4

On February 22, 2001, ZiaLink continued to experience authentication problems, and VHP suffered a defacement of one of the websites it hosted. *Id*. at ¶ 31. The individual responsible for the defacement was logged onto the network under an "administrative user" account. *Id*. Further, an intruder had installed a "DameWare" software program onto a ZiaLink network computer, had downloaded a database containing usernames and passwords, and had enabled two user accounts, including one under the name "tucka." *Id*. The DameWare software was remotely operated from the "tucka" account. *Id*. Collier's investigation further revealed that Fenzl used "tucka" and iterations of "tucka" as a username when accessing the Internet. *Id*. at ¶ 32. In fact, Fenzl had received e-mail at addresses such as "tucka@thecutaways.com," "tucka@tomFenzl.com," and "tucka@nmhu.edu." *Id*. An e-mail message sent to VHP from Fenzl dated Tuesday, February 20, 2001, was sent from the "tucka@thecutaways.com" e-mail address, and Fenzl was known to utilize the "tucka" username on ICQ (similar to America On Line Instant Messenger). *Id*. In addition to Fenzl's utilization of the "tucka" username on the Internet, Fenzl also has used "tucka" as his system administrator username on the VHP computer network as well as other computer networks previously supported by his consulting business. *Id*.

The investigation prior to March 23, 2001, determined that in order for an individual to accomplish an administrative shutdown, effecting an attack such as that on VHP's network, that individual must be logged in as a system administrator. *Id*. at ¶ 34. Collier also determined that in order to initiate an administrative shutdown the intruder must have a thorough understanding of the victim's network architecture to include the appropriate ports to log on to and which ports to shut down. *Id*. At the time of the intrusions, Fenzl retained knowledge of the VHP infrastructure, maintained administrative user privileges, and had motive to disrupt the system. *Id*.

5

On March 23, 2001, based upon this information and other information contained in the affidavit, United States Magistrate Judge Don J. Svet issued a search warrant to Collier. The warrant authorized Collier to search Fenzl's residence and garage located at 414 ½ Union St. in Las Vegas, New Mexico, and to seize various computer equipment, printouts or notes.  Complaint, Exhibit 2. On March 26, 2001, Collier and other law enforcement officials entered and searched the buildings, pursuant to the search warrant.  Complaint, ¶¶ 6-7.  As a result of the search, FBI agents seized computers and computer equipment belonging to Fenzl.[1]  Complaint, ¶ 9.

Fenzl alleges in his Complaint that a "majority" of the items seized were not returned until December 2003, *id.* at ¶ 16, and further that much of the equipment was damaged or not in working order once returned.  *Id.* at ¶¶ 20-22.  He also alleges that the seized computer equipment was put to public use without compensation. *Id.* at ¶¶ 48-49.  Additionally, Fenzl alleges that because of the length of time of the seizure, the value of the computer equipment diminished to a value "near zero." *Id.* at ¶ 23.

Fenzl filed his "Verified Complaint for Damages and for Compensation Under 42 U.S.C. § 1983" [Doc. No. 1] in March, 2004.  Fenzl claims in Count I that Defendant lacked probable cause to obtain the search warrant and as such the arrest, search and seizure were unreasonable; in Count II that seizing Fenzl's property constituted an illegal taking as his property was taken for public use without just compensation in violation of the Fifth Amendment; in Count III that Collier retaliated against him in violation of the Fifth Amendment; in Count IV that Collier violated his constitutional rights to due process and equal protection; and in Count V that Collier is liable for the tort of

---

[1] At some point, law enforcement officers allegedly arrested Fenzl, but the record before the Court does not reveal if the arrest took place on the day of the search or at some later date.

intentional infliction of emotional distress.

On August 2, 2004, Collier filed his Motion to Dismiss Based on Qualified Immunity and Memorandum in Support in Support of Motion to Dismiss [Doc. No. 10]. Collier argues that he is entitled to qualified immunity because he had probable cause to seek the warrant. Collier does not address each of Fenzl's claims separately or analyze whether qualified immunity should apply to each such claim. Fenzl contends that the motion as written applies only to Count I of the complaint. Collier does not respond to this argument.

## LEGAL STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee, Okl*, 119 F.3d 837, 840 (10th Cir. 1997). "'Instead, the movant only bears the initial burden of 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*,

477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim.  *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzsche v. Albuquerque Municipal Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  A court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence."  *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).  If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.  *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense in a suit under 42 U.S.C. § 1983.  Qualified immunity bars Section 1983 suits against defendants in their individual—but not official—capacities.  *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citations omitted).  The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling threats of liability."  *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).  It provides immunity from suit and not merely from liability.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  It therefore spares defendants the burden of going forward with trial.  *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995) (citing *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989)), *abrogated on other grounds*, *Saucier v. Katz*, 533 U.S. 194 (2001).  Accordingly, the qualified

immunity defense should be raised and resolved as early as possible in the litigation.[2]  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the right was clearly established at the time such that a reasonable person in the official's position would have known that the conduct violated the right.  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The second part of this inquiry requires a court to "assess[] the objective legal reasonableness of the action at the time of the alleged violation and ask[] whether 'the right was sufficiently clear that a reasonable officer would understand that what he [or she was] doing violates that right.'"  *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quotation omitted); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations omitted).

The record must clearly demonstrate the plaintiff satisfied his two-part burden. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity.  *See Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  If the nonmoving party, however, successfully demonstrates the violation of a clearly established right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would

---

[2]Fenzl argues in his response that "[i]t is probably improper for the Court to even consider a motion to dismiss based upon qualified immunity at this juncture."  The Court disagrees.  As *Holland* states, qualified immunity should be raised as early as possible in the litigation as possible.  268 F.3d at 1185.  In *Holland,* 10th Circuit noted that "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  *Id.*

defeat its claim for qualified immunity.  *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992).

## DISCUSSION

Collier has moved for summary judgment on the "cause against him" on the basis that he had probable cause to seek a search warrant of Fenzl's property.[3]  Brief in Support of Motion to Dismiss at p. 23.  However, Fenzl asserts five separate counts in the Complaint.  Fenzl's claims can be grouped into two categories.  First, Count I pertains to the reasonableness of the acquisition of the warrant and the lawfulness of Collier's conduct through the time of the search, seizure, and arrest.  Those claims are at issue here.  Second, in the remainder of the Complaint Fenzl makes claims regarding Collier's actions that took place following the search and seizure of the property, such as those relating to the length of time Collier held the computer equipment.  The Court does not construe the motion for summary judgment as one relating to those claims.

## I.    CLAIMS PERTAINING TO THE ACQUISITION OF THE WARRANT AND THE SUBSEQUENT SEARCH, SEIZURE, AND ARREST

In Count I of his complaint, Fenzl alleges that Collier conducted an unreasonable search and seizure of his property in violation of the Fourth Amendment and arrested him without probable cause, and that he is therefore entitled to relief under 42 U.S.C. § 1983.[4]  More specifically, Fenzl

---

[3]As noted above, it is unclear which legal claims Collier intends to address in his motion. Because Collier discusses only the reasonableness of the search and seizure, the Court will address only Count I, which pertains to the propriety of the warrant and the subsequent search and seizure.

[4]Section 1983 provides in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42

alleges that Collier omitted and misrepresented information in his affidavit for the purpose of securing

a warrant, and that he "intentionally and maliciously made false and misleading statements" in his

affidavit to secure the warrant.  Complaint, ¶¶ 46-47.  Thus, Fenzl's claim for unlawful arrest, search

and seizure may be characterized as a violation of the Fourth Amendment.[5]  Because "Section 1983

creates no substantive civil rights, but rather only a procedural mechanism for enforcing them," the

Court's analysis focuses on the alleged violation of the Fourth Amendment.  *Wilson*, 52 F.3d at 1552

(citation omitted); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

A.   **Violation of a Constitutional Right**

Because Collier has raised a qualified immunity defense, the Court must evaluate the merits

of the defense under the modified summary judgment standard that applies to public officials who

assert qualified immunity.  *See, e.g.*, *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996).  To

determine whether Fenzl has satisfied the first part of his burden under this standard by establishing

a constitutional violation, the Court must look to the substantive law in effect at the time the conduct

in question occurred.  *See Saucier v. Katz*, 533 U.S. 194, 199 (2001).  Here Fenzl alleges, *inter alia*,

---

U.S.C. § 1983.

Section 1983 provides civil redress for deprivation of constitutional rights by persons acting under color of state law.  *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995); 42 U.S.C. § 1983. Here, the Defendant is a federal actor, acting under the color of federal law. Claims under § 1983 are available only against defendants who act under color of state, not federal law. *Daly-Murphy v . Winston*, 837 F.2d 348, 355 (9th Cir. 1987). As such, the Court will construe the complaint solely under the holding of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

[5]The Fourth Amendment provides: "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.

that Collier conducted an unlawful search and seizure of his property by omitting and misrepresenting material information to obtain a warrant that was not based upon probable cause.[6]   In contrast, Collier maintains that his actions were objectively reasonable under the totality of the circumstances. The Court concludes that, on the record presently before the Court, Fenzl has failed to demonstrate the existence of a genuine issue of material fact on the issue of whether Collier either lied or acted in reckless disregard of the truth in violation of Fenzl's constitutional rights, and therefore the motion for summary judgment will be granted with regard to Count I of the complaint.

The reasonableness requirement forms the core of Fourth Amendment analysis. The Fourth Amendment only denounces searches and seizures that are unreasonable. *Brinegar v. U.S.*, 338 U.S. 160, 164 (1949). In issuing a valid warrant, it must appear to the judge from the affidavits supporting the application for the warrant that "there is probable cause to believe that an offense has been committed and that the defendant has committed it...." *Kaul v. Stephen*, 83 F.3d 1208, 1213 (10th Cir. 1996). Generally, in determining the sufficiency of an affidavit as establishing probable cause, the Court reviews the application in a "common sense and realistic manner," in order to determine whether a reasonable person would believe that evidence of a crime is being committed on the premises to be searched. *United States v. Rahn,* 511 F.2d 290, 292 (10th Cir. 1975). The affidavit need not include information establishing a certainty that objects will be found as a result of the search, and missing information will not be fatal to a determination that probable cause exists. *Id.* at 293. In the face of a valid search warrant, a government agent loses the shield of immunity only

---

[6]Because Defendant obtained a warrant the search and subsequent seizure of property cannot be considered unreasonable per se. *See, e.g., United States v. Glover*, 104 F.3d 1570, 1583 (10th Cir. 1997). Rather, Fenzl attacks the sufficiency and validity of the facts presented in the affidavit to the magistrate judge.

where his application for the warrant "is so lacking in indicia of probable cause as to render official belief in its existence unreasonable," despite a magistrate's authorization. *Kaul*, 83 F.3d at 1213 n. 4.

The Court construes Fenzl's allegation as a Fourth Amendment claim that Collier "knowingly and intentionally, or with reckless disregard for the truth," included false statements or made deliberate omissions in the application for a search warrant. *See Franks v. Delaware*, 438 U.S. 154, 171-72 (1978). "Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, the shield of qualified immunity is lost." *Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991) (citations omitted). *See also Clanton v. Cooper*, 129 F.3d 1147, 1154 (10th Cir. 1997). In order for Fenzl to survive a motion for summary judgment on this type of Fourth Amendment claim, he must make a "substantial showing of deliberate falsehood or reckless disregard for the truth, such that would be needed to challenge the presumed validity of an affidavit supporting a search warrant under *Franks*. . . ." *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990) (citation omitted). This substantial showing is met if the plaintiff comes forward with *specific evidence* of dishonesty. *Id.* (emphasis added). Then, the plaintiff must establish that "but for the dishonesty, the challenged action would not have occurred." *Id.* (citations omitted). The burden for Fenzl is substantial. In fact, even "subjective bad faith of an officer will not defeat qualified immunity if the officer's conduct was objectively reasonable." *Id.* at 698.

In his response brief [Doc. No. 10], Fenzl claims that Collier had "improper motives" in seizing the equipment under a warrant he knew to be false. Plaintiff's Response to Motion to

Dismiss, p. 2.  Fenzl also alleges that Collier's post-search and seizure conduct was "indicative of Collier's bad faith and malicious intent."  *Id.*  As explained above, however, Collier's subjective motives are not relevant.  The question is whether he had objectively reasonable cause to believe that the contents of his affidavit were true.  *Harlow v. Fitzgerald*, 457 U.S. 800, 815-16 (1982) (holding that the qualified immunity analysis does not consider subjective good faith. because "the subjective element of the good-faith defense frequently has proved incompatible with our admonition [] that insubstantial claims should not proceed to trial.").

In addition, Fenzl responds to the information contained in the Second Collier Affidavit (Doc. No. 11) by alleging additional facts and making arguments he feels should have been considered by Collier and presented to Judge Svet if Collier's motives in seeking the search warrant had been benign. Response, pp. 4-10.  For example, Fenzl offers alternate explanations (none of which incriminate him) for the technical communication problems suffered by VHP and Genesys's computers in February of 2001, and contends that Collier should have presented these alternate explanations to the magistrate judge. Fenzl also argues that these omissions provide "obvious reasons for doubting the truthfulness of Collier's allegations."  *Id.* at 13.  The alleged facts, however, are merely the argument of counsel; they are unsupported by an affidavit and therefore cannot create a genuine issue of material fact. Furthermore, the probable cause standard does not require that the officer seeking the warrant establish beyond all doubt that the subject of the search has committed a crime. Rather, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The Supreme Court further stated in *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), that "[t]he probable-cause standard is incapable of precise definition or quantification into percentages

because it deals with probabilities and depends on the totality of the circumstances." As the Supreme Court has explained, the substance of probable cause "is a reasonable ground for belief of guilt. . . [I]t has come to mean more than bare suspicion: Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (internal quotations omitted). Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to qualified immunity. *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). In this case, Fenzl is essentially arguing that Collier and the magistrate judge should have drawn inculpatory inferences from the facts in Collier's affidavit. However, based upon the current record the Court cannot conclude that there is a genuine issue of fact as to whether Collier knowingly lied or acted in reckless disregard for the truth.

Fenzl also argues that Collier improperly relied upon hearsay in the affidavit presented to Judge Svet. This argument fails as well, because reliance upon hearsay does not necessarily undermine the truthfulness of an affidavit supporting a search warrant: "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Franks*, 438 U.S. at 165.

In his supplemental response brief (Doc. No. 34), Fenzl contends that the affidavit of Dora Fenzl (attached as Ex. 1 to the supplemental response) creates a genuine issue of material fact. In her affidavit, Dora Fenzl states that she never told Bernard Schaer that her husband was using his T1 line for illegal purposes. This, contends Fenzl, raises the inference that Collier lied to Judge Svet in his affidavit in support of the application for search warrant. The Court disagrees. In his affidavit, Collier

15

said that Schaer told him that Dora Fenzl had made those accusations against her husband. Collier relied upon the hearsay statement by Schaer, as one may when establishing probable cause, but there is no evidence in the record to support an inference that a reasonable agent would either know or have reason to believe that Schaer was lying about his conversation with Dora Fenzl.[7]

Fenzl also assigns great weight to the fact that in his original affidavit presented to Judge Svet, Collier does not reveal the identity of the person who accused Fenzl of using the T1 line for illegal activity, merely referring to that person as "the caller." (First Collier Aff. at ¶ 23, attached as Ex. 1 to Complaint, Doc. No. 1). Fenzl contrasts that to Collier's second affidavit, in which he identifies the informant as Dora Fenzl. (Doc. No. 11, Second Collier Aff. at ¶¶ 6, 15). Fenzl characterizes Collier's failure to identify Dora Fenzl in his first affidavit as a "material omission . . . of gravity sufficient to cast doubt on the integrity of the affidavit." (Doc. No. 34 at p. 4). The Court has difficulty following this logic. In March of 2001 there may have been several reasons why Collier may have felt the need to conceal Dora Fenzl's identity which did not exist more than three years later when he executed his second affidavit. From this one inconsistency, it does not necessarily follow that the entire affidavit contains falsehoods. However, the point is moot. If, for the sake of argument, the Court were to assume that Collier lied about Doral Fenzl accusing her husband of illegal activity and therefore exclude paragraph 23 of the First Collier Affidavit, the affidavit would still contain sufficient facts to establish probable cause for a search of Fenzl's home. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004) ("In the case of a Fourth Amendment claim of falsified evidence, the existence of probable cause is determined by setting aside the false information and reviewing the remaining

---

[7] If Fenzl had presented an affidavit by Schaer denying that he ever made that statement to Collier, that would create a genuine issue of material fact as to whether that portion of Collier's affidavit was truthful. However, there is no such affidavit in the record.

contents of the affidavit.").

In addition, Fenzl has attached both is own affidavit and that of Philip Cross ("Cross") to his supplemental brief.  (Exs. 3 and 4 to Doc. No. 34).  Again, neither affidavit creates a substantial showing that Collier's affidavit is based upon deliberate falsehood or reckless disregard for the truth. Cross's affidavit describes his questioning by Collier "in the first part of 2001."  While the facts stated in the Cross affidavit might be used to support an inference that Collier had subjectively improper motives toward Fenzl, it does nothing to contradict the truth of the factual assertions in either Collier affidavit.  The same is true of Fenzl's affidavit, which describes the conduct of Collier and other federal agents both on the day of the search of Fenzl's property, as well as on subsequent occasions. That affidavit contains no evidence to support a conclusion that the facts Collier set forth in his first affidavit were untrue or made with reckless disregard for the truth.

Under the modified summary judgment standard, it is Fenzl's burden to come forth with specific evidence that the warrant was obtained by misleading or false information.  Here, Fenzl has attempted to demonstrate that Collier had an improper motive in seeking the search warrant. However, Fenzl has come forth with insufficient evidence to meet his burden on summary judgment. His assertions fail to rise to the level of a "substantial showing of deliberate falsehood or reckless disregard for the truth, such that would be needed to challenge the presumed validity of an affidavit supporting a search warrant under *Franks*."  *Snell*, 920 F.2d at 698.

Furthermore, under this standard, even if Fenzl's evidence could be construed as evidence supporting an improper motive, the officer will only lose the shield of qualified immunity if the grounds for seeking the warrant are objectively unreasonable.  The evidence presented by Collier and summarized above reflects the information that was presented to the magistrate judge to obtain the

17

search warrant.  Those facts demonstrate that Fenzl had the technical knowledge, physical access, motive, and opportunity to carry out an attach on the Genesys and VHP computer systems.  Further, evidence regarding the identity of the attacker showed a substantial link to Fenzl, who often used the "tucka" name in his email addresses and screen names.  The Court holds that, taken in their entirety, the facts presented to Judge Svet were sufficient to establish probable cause for the search and seizure.

Fenzl's next argument is that the statute that Fenzl is alleged to have violated, 18 U.S.C. § 1030, contains a requirement that the alleged unauthorized computer access must have caused at least $5,000 in damage.[8]  Fenzl contends that because Collier's affidavit does not mention this requirement or the dollar value of the damage done to VHP, EuroDebit, and Genesys, the Court should infer that the omission was intentional and that Collier deliberately failed to inform the magistrate judge of the damage requirement in order to fraudulently obtain the warrant.[9]  The Court notes that this argument is new and was not raised in Fenzl's response to the motion to dismiss.  In converting the motion to one for summary judgment, the Court gave Fenzl the opportunity to present affidavits and rebrief the issues raised by the motion to dismiss.  Noting that Collier had already attached matters outside the pleadings to his motion, the Court granted Collier no "second bite at the apple."  However, the Court did not grant Fenzl the right to raise entirely new arguments (never previously pled or argued) to which Collier has had no opportunity to respond.  The Court declines to address those new arguments here.

---

[8] The statute defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information, that causes loss aggregating to at least $5,000 in value during any 1-year period to one or more individuals."  18 U.S.C. § 1030(e)(8)(A).

[9] Fenzl does not contend that the damage to VHP, Genesys, and EuroDebit as a result of the attack was less than $5,000, merely that Collier failed to mention the amount of damage in his affidavit.

Fenzl's final argument (Doc. No. 34 at p. 9) is that the Court should hold its ruling in abeyance under Rule 56(f) so that he may have the opportunity to conduct further discovery.  Fed. R. Civ. P. 56(f) provides:

> **When affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

A prerequisite to granting relief under Rule 56(f), however, is an affidavit furnished by the nonmovant.  *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 832 (10th Cir. 1986). Although the affidavit need not contain evidentiary facts, it must explain why the nonmovant is unable to present facts precluding summary judgment.  "This includes identifying the probable facts not available and what steps have been taken to obtain these facts.  In this circuit, the nonmovant also must explain how additional time will enable him to rebut movant's allegations of no genuine issue of fact." *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992) (internal citations and quotations omitted).  Fenzl has met neither of these criteria, and therefore his request for a stay under Rule 56(f) will be denied.

In light of the foregoing, the Court concludes that the Fenzl has not satisfied the first part of his burden under this standard by establishing a constitutional violation.

**B.**    **Clearly Established Right**

Where the plaintiff is unable to marshal evidence to support the contention that the officer's conduct violated the law, it is unnecessary to consider whether the law was clearly established at the

time of the time of the alleged violation.  *Snell*, 920 F.2d at 696 n. 21.[10]

Having determined that there is no violation of a constitutional right, the Court finds that there is no need to analyze whether the right was clearly established.  Because Fenzl was unable to prove with actual evidence that Collier violated a constitutional right, Collier is entitled to qualified immunity with respect to Fenzl's claims pertaining to the search of his residence and seizure of his property.

## II.    PLAINTIFF'S REMAINING CLAIMS

Fenzl raises various additional claims for alleged violations of his constitutional rights arising from events that occurred after the search and subsequent seizure of his property.  Fenzl alleges in his Complaint that the seizure of his property constituted an illegal taking because his property was put to public use without compensation; that the seizure "cloaked a de facto forfeiture of costly computer equipment;" that he was harassed and humiliated due to his national origin; and that Collier intentionally and deliberately inflicted emotional distress upon Fenzl. These claims focus on Collier's actions following the search and seizure of the property.  However, as the Court construes Collier's motion, he has raised the defense of qualified immunity only as to those claims in Count I pertaining to Collier's conduct in acquiring the warrant, and the search and seizure of Fenzl's property.  Further, Collier does not dispute Fenzl's contention that the motion applies only to Count I.  Therefore, because the motion for summary judgment does not apply to them, the Court will not address Fenzl's remaining claims at this time.

In accordance with the foregoing, **IT IS THEREFORE ORDERED** that *Defendant's Motion to Dismiss Based on Qualified Immunity* [Doc. No. 9], which the Court has converted to a motion

---

[10]Nonetheless, the principle that persons may not be subjected to unreasonable search and seizure is clearly established.  *See, e.g., Pueblo Neighborhood Health Ctrs.,* 847 F.2d at 647; U.S. Const. Amend. IV.

for summary judgment, is **GRANTED** with regard to Count I of the Complaint.


_____

**UNITED STATES DISTRICT JUDGE**